No. 3091

Article 7, Section 3 of the Constitution of Texas does not confer upon the State Board of Education the power to control the expenditure of the State Textbook Fund and the Legislature has authority to limit the number of employees that the State Board of Education may hire and pay out of the State Textbook Fund in the purchasing and distribution of textbooks.

---

OFFICE OF THE ATTORNEY GENERAL

November 7, 1939

Honorable Geo. H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

Opinion No. O-561
Re: Whether the Legislature has authority to limit the number of employees that the State Board of Education may hire in the purchasing and distribution of textbooks.

We acknowledge receipt of your letter in which you request the opinion of this Department upon the following questions:

"Conceding that the Legislature by Article 3, Section 44, of the Constitution, has the authority to provide by law for the compensation of all officers, servants, agents and public contractors, which include the employees of the State Board of Education, would the Legislature have authority to limit the number of employees that the State Board of Education may hire in the purchasing and distribution of textbooks? In other words, if the number of employees provided for in the present appropriation bill for the State Board of Education is insufficient for the purchasing and distribution of textbooks, then would the State Board of Education be authorized to employ additional help and pay for same out of the Textbook Fund?"

Our answer to your first question is that in our opinion the Legislature has authority to limit the number of employees that the State Board of Education

may hire in the purchasing and distribution of textbooks. It follows from our answer to your first question that, in our opinion, if the number of employees provided for in the present appropriation bill for the State Board of Education is insufficient for the purchasing and distribution of textbooks, the State Board of Education would not be authorized to employ additional help and pay for the same out of the textbook fund, and said board is limited to the number of employees specified in the appropriation bill.

The answers to your questions depend on the proper construction of Article 7, Section 3, of the Texas Constitution, and in arriving at the correct construction of this constitutional provision, we believe that it is important to consider the history of the constitutional and statutory provisions relating to the purchase and distribution of free textbooks by the State of Texas. Prior to the adoption of the amendment to Article 7, Section 3, of the Constitution of Texas, at the election of November 5, 1918, there was no provision in the Constitution for the purchase or distribution of free textbooks to the school children attending the public schools of this State. Article 7, Section 3, prior to said amendment, read as follows:

"Sec. 3. One-fourth of the revenue derived from the state occupation taxes and a poll tax of one dollar on every male inhabitant of this state, between the ages of twenty-one and sixty years, shall be set apart annually for the benefit of the public free schools; and, in addition thereto, there shall be levied and collected an annual ad valorem state tax of such an amount, not to exceed twenty cents on the one hundred dollar valuation, as, with the available school fund arising from all other sources, will be sufficient to maintain and support the public free schools of this state for a period of not less than six months in each year; and the legislature may also provide for the formation of school districts by general or special law, without the local notice required in other cases of special legislation; and all such school districts, whether created by general or special law, may embrace parts of two or more counties, and the legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts, and for the management and control of the public school or schools of such district, whether such districts are composed of territory wholly within a county or in parts of two or more counties. And the legislature may authorize an additional ad valorem tax to be levied and collected within all school districts, heretofore formed or hereafter formed, for the further maintenance of public free schools, and the erection and equipment of school buildings therein; provided, that a majority of the qualified property tax-paying voters of the district, voting at an election to be held for that purpose, shall

vote such tax, not to exceed in any one year
fifty cents on the one hundred dollar valua-
tion of the property subject to taxation in
such district, but the limitation upon the
amount of school district tax herein authorized
shall not apply to incorporated cities or towns,
constituting separate and independent school
districts. (Sec. 3, Art. 7, adopted election
August 3, 1909; proclamation September 24,
1909.)"

The amendment to Article 7, Section 3, of the
Constitution was proposed by House Joint Resolution No.
27 of the Regular Session of the 35th Legislature, which
was approved March 19, 1917. Section 1 of this resolu-
tion proposed that Article 7, Section 3, of the Constitu-
tion, be amended so as to read as follows:

"One-fourth of the revenue derived from
the State occupation taxes and a poll tax of
one ($1.00) dollar on every male inhabitant
of this State, between the ages of twenty-one
and sixty years, shall be set apart annually
for the benefit of the public free schools;
and, in addition thereto, there shall be levied
and collected an annual ad valorem State tax
of such an amount not to exceed thirty-five
cents on the one hundred ($100.00) dollar val-
uation, as, with the available school fund
arising from all other sources, will be suf-
ficient to maintain and support the public
schools of this State for a period of not
less than six months in each year and it shall
be the duty of the State Board of Education
to set aside a sufficient amount out of the
said tax to provide free text books for the
use of children attending the public free
schools of this State; provided, however,
that should the limit of taxation herein
named be insufficient the deficit may be
met by appropriation from the general funds
of the State and the Legislature may also
provide for the formation of school districts
by general or special law without the local
notice required in other cases of special
legislation; and all such school districts,
whether created by general or special, law
may embrace parts of two or more counties.
And the Legislature shall be authorized to
pass laws for the assessment and collection
of taxes in all said districts, and for the
management and control of the public school
or schools of such district, whether such
districts are composed of territory wholly
within a county or in parts of two or more
counties. And the Legislature may authorize
an additional ad valorem tax to be levied
and collected within all school districts

heretofore formed or hereafter formed, for the
further maintenance of public free schools,
and the erection and equipment of school build-
ings therein; provided, that a majority of the
qualified property taxpaying voters of the dis-
trict voting at an election to be held for that
purpose, shall vote such tax, not to exceed in
any one year fifty cents on the one hundred
dollar valuation of the property subject to
taxation in such district but the limitation
upon the amount of school district tax herein
authorized shall not apply to incorporated
cities or towns constituting separate and in-
dependent school districts." (Emphasis added)

Section 2 of said resolution provided that the
question of the adoption or rejection of the proposed
amendment should be submitted to the voters in the follow-
ing manner:

"The foregoing constitutional amendment
shall be submitted to a vote of the qualified
electors of the State at an election to be
held throughout the State on the first Tues-
day after the first Monday in November, 1918,
at which election all voters favoring said
proposed amendment shall write or have printed
on their ballots the words, 'For the amendment
to the Constitution of the State of Texas provid-
ing for the levy of a special school tax for the
maintenance of the public schools of the State
and to provide free text books in the public
schools of the State of Texas,' and all those
opposed shall write or have printed on their
ballots the words, 'Against the amendment to
the Constitution of the State of Texas provid-
ing for the levy of a special school tax for
the maintenance of the public schools of the
State and to provide free text books in the
public schools of the State of Texas.'" (Em-
phasis added)

We call attention to the fact that the only
questions submitted to the voters as to the proposed
constitutional amendment were, in effect, whether there
should be levied a special school tax for the maintenance
of the public schools of the State, and whether the State
should provide free textbooks in the public schools of
the State. There was nothing whatever to indicate, in
the manner of the submission of the amendment to the
voters, that the proposed amendment was to place exclusive
control in the State Board of Education over the textbook
fund.

The question is presented, however,-why was it
provided in Article 7, Section 3, as amended, that the
Board of Education should set aside a sufficient amount
out of said tax to provide free textbooks for the use of
the children attending the public free schools of this
State? We believe that the answer to this question is
found in the situation which then existed with reference

to the distribution of the school funds. Article 7,
Section 8, of the Constitution as then in force pro-
vided as follows:

"The Governor, Comptroller and Secretary
of State shall constitute a Board of Education,
who shall distribute said funds to the several
counties and perform such other duties concern-
ing public schools as may be prescribed by law."

It will be seen that the Constitution then pro-
vided that the Board of Education should distribute the
school funds among the various counties of the State. In
order to avoid a conflict between this provision of Art-
icle 7, Section 8, and the proposed amendment to Article
7, Section 3, it was provided in said amendment that a
sufficient amount to provide for free textbooks should
be set aside by the Board of Education, before distribut-
ing the balance of the school funds to the counties. The
purpose of delegating this duty to the Board of Education
was simply to provide that enough of the school funds
should be set aside to provide for free textbooks before
a distribution should be made of the balance of the funds
to the counties, and the purpose was not to confer on the
Board of Education control over the textbook fund so set
aside.

There have been amendments to both Sections 3 and
8 of Article 7 of the Constitution since 1918. An amend-
ment to Article 7, Section 3, of the Constitution was pro-
posed by Senate Joint Resolution 17, 36th Legislature,
Regular Session (1919), and this amendment was adopted at
the election held on November 2, 1920. This amendment,
however, did not change the provisions relating to free
textbooks. Section 3 of Article 7 was later amended by
an amendment adopted at an election held on November 2,
1926, so that said section now reads as follows:

"One-fourth of the revenue derived from
the State occupation taxes and poll tax of one
dollar on every inhabitant of the State, between
the ages of twenty-one and sixty years, shall
be set apart annually for the benefit of the
public free schools; and in addition thereto,
there shall be levied and collected an annual
ad valorem State tax of such an amount not to
exceed thirty-five cents on the one hundred
($100.00) dollars valuation, as with the avail-
able fund arising from all other sources, will
be sufficient to maintain and support the pub-
lic schools of this state for a period of
not less than six months in each year, and
it shall be the duty of the State Board of Ed-
ucation to set aside a sufficient amount out
of the said tax to provide free text books
for the use of children attending the public
free schools of this State; provided, however,
that should the limit of taxation herein named
be insufficient the deficit may be met by ap-
propriation from the general funds of the State
and the Legislature may also provide for the
formation of school district (s) by general
laws; and all such school districts may em-
brace parts of two or more counties, and the
Legislature shall be authorized to pass laws

for the assessment and collection of texes in all said districts and for the management and control of the public school or schools of such districts, whether such districts are (are) composed of territory wholly within a county or in parts of two or more counties. And the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the further maintenance of public free schools,and for the erection and equipment of school buildings therein; provided that a majority of the qualified property tax-paying voters of the district voting at an election to be held for that purpose, shall vote such tax not to exceed in any one year one ($1.00) dollar on the one hundred dollars valuation of the property subject to taxation in such district, but the limitation upon the amount of school district tax herein authorized shall not apply to incorporated cities or towns constituting separate and independent school districts, nor to independent or common school districts created by general or special law. (Sec. 3, Art. 7, adopted election November 2, 1926; proclamation January 20, 1927.)" (Emphasis added)

It will be noted that the 1926 amendment to Section 3 of Article 7 of the Constitution effected changes only in the manner in which the Legislature could provide for the formation of school districts and the amount of tax which could be voted in school districts, and did not alter the provisions with reference to the duty of the Board of Education to set aside a sufficient amount to provide for free textbooks.

Section 8 of Article 7 of the State Constitution was amended November 6, 1928, so that said section now reads as follows:

"The Legislature shall provide by law for a State Board of Education, whose members shall be appointed or elected in such manner and by such authority and shall serve for such terms as the Legislature shall prescribe not to exceed six years. The said board shall perform such duties as may be prescribed by law."

The effect of this amendment to Article 7, Section 8, of the Constitution, was to remove from the Board of Education the constitutional mandate to distribute the school fund to the counties, and also to place the creation of the board and the manner of election and the tenure of office of its members within the control of the Legislature. The Legislature continued to have the power to confer powers and duties on the Board of Education in addition to the duty imposed by Article 7, Section 3, of the Constitution, upon said Board, of setting aside a sufficient amount out of the school fund to provide free textbooks.

5763

Honorable Geo. H. Sheppard, November 7, 1939, page 7

An examination of the legislative history of the statutes relating to free textbooks and the appropriation laws since the adoption of the 1918 amendment to Article 7, Section 3, shows the absence of any construction by the Legislature of Article 7, Section 3, as conferring on the Board of Education exclusive control over the textbook fund.

At the time of the adoption of the amendment to Article 7, Section 3, of the Constitution on November 5, 1918, the statute then in effect relating to the adoption of textbooks was Chapter 44 , Acts 35th Legislature, First Called Session, page 183, approved June 5, 1917 (Articles 2909a through 2909oooo of Vernon's Complete Texas Statutes, 1920). This statute provided for "The Texas State Textbook Commission," to be composed of the Governor and the Superintendent of Public Instruction, together with seven persons to be appointed by the Governor. The Textbook Commission was authorized to adopt books to be used exclusively in the public free schools of this State, but it was expressly provided by Section 16 of said act that the State of Texas should not be liable to any contractor for any sum whatsoever, and that such contractors should receive compensation solely and exclusively from the proceeds of the sale of such books to persons other than the State. It was provided, however, in Section 31 of said act that in the event the proposed amendment to Article 7, Section 3, of the Constitution should be adopted at the election held in November, 1918, the State should have the right to purchase the books covered by an unexpired contract at the prices provided in such contract.

After the adoption of the amendment to Article 7, Section 3, of the Constitution on November 5, 1918, the Legislature passed Chapter 29 of the Acts of the Regular Session of the Thirty-sixth Legislature, page 41, approved February 25, 1919. This act is incorporated in Vernon's Complete Statutes, 1920, as Articles 2904½ through 2904½v, inclusive, and is substantially copied in Articles 2856 through 2876j of the Revised Civil Statutes, 1925. The purpose of this act, as recited in the emergency clause, was to put into effect the constitutional amendment providing for free textbooks for the children of this State. The act contains twenty-five sections and makes detailed provisions with regard to the purchase and distribution of free textbooks by the Board of Education. After providing in the first three sections of this act that the State Board of Education shall purchase and distribute textbooks used in the public free schools of this State, and shall set aside annually a sufficient amount out of the available school fund to purchase and distribute the necessary school books, and that this fund shall constitute the State textbook fund, together with other funds accruing from the sale of disused books, etc., it is further provided in Sections 4 and 5 of said act as follows:

"Sec. 4. The State Board of Education shall require from the State Superintendent, on July first of each year, a report as to the funds necessary for the purchase and distribution and other necessary expenses of school books for the regular school session of the following year, and said Board of Education shall have the power to set apart

from the available school fund the estimated
amount with 25 per cent additional, this ad-
ditional sum to be used only to meet emergen-
cies or necessities caused by unusual increase
in scholastic attendance or by unusual and un-
foreseen expenses and school conditions. Funds
transferred to the Text Book fund shall remain
permanently in this fund, until expended and
shall not lapse to the State at the close of
the fiscal year; provided, that the State Sup-
erintendent of Public Instruction shall be re-
quired to include in the aforementioned report
to the State Board of Education a statement as
to the amount of this fund which is unexpended,
and said amount shall be considered by the
Board in determining the necessary expenditures
for text books for the following year.

"Sec. 5. The purchase and distribution
of free text books for the State shall be un-
der the management of the State Superintendent
of Public Instruction, subject to the approval
of the State Board of Education. All details
of plans for purchase and distribution of books
not definitely covered by the provisions of this
law shall be subject to the laws of the State
and approval of the State Board of Education."

The above quoted sections are substantially the
same as Articles 2869 and 2870 of the Revised Civil Stat-
utes, 1925.

Chapter 29 of the Acts of the 36th Legislature,
referred to above, makes no mention of the Texas State
Textbook Commission and does not contain any repealing
clause. By Chapter 34 of the Acts of the First Called
Session of the 37th Legislature, 1921, the Legislature
recognized the continued existence of the Texas State
Textbook Commission by amending Sections 4 and 14 of
Chapter 44, Acts First Called Session, 35th Legislature,
so as to provide that contracts for textbooks could be
renewed by the Textbook Commission.

The confusion in the statutes with reference to the
powers of the State Board of Education and the Texas State
Textbook Commission, led to the litigation involved in the
cases of American Book Company v. Marrs, 113 Texas 291,
253 S. W. 817, and Charles Scribner's Sons v. Marrs, 114
Texas 11, 262 S. W. 722. In the first of these cases it
was decided that under the Constitution and the statutes
then in effect at the time of the decision of said case
(June 30, 1923) the State Board of Education had final con-
trol over the making of contracts for the purchase of
free text books, and that a contract made by the Text Book
Commission without the authority of the Board of Education
was void. In Charles Scribner's Sons v. Marrs, supra, it
was decided that a contract for the purchase of textbooks,
by the Textbook Commission, approved by the Board of Educa-
tion was enforceable by a writ of mandamus against the
Superintendent of Public Instruction.



The statutes relating to the State Textbook Commission and the State Board of Education were combined by the enactment of Chapter 176, Acts Regular Session, 39th Legislature, (1925), page 417, which was substantially incorporated in the Revised Civil Statutes of 1925, as Articles 2839 through 2875j, inclusive. The Textbook Commission was still retained and was given power to adopt books to be used in the schools, but it was further provided that the State Board of Education should be authorized to purchase books and to distribute the same to the pupils in the schools and in Section 34 of said act (Article 2870, Revised Civil Statutes, 1925) it was provided that, "The purchase and distribution of free text books for the State shall be under the management of the State Superintendent of Public Instruction, subject to the approval of the State Board of Education."

As we have previously pointed out, Article 7, Section 8, of the Constitution was amended by an amendment adopted at an election held on November 6, 1928, so as to empower the Legislature to provide for a State Board of Education, whose members shall be appointed or elected in such manner and shall serve such term as the Legislature shall prescribe, not to exceed six years, and which board shall perform such duties as may be prescribed by law. Following this amendment of the Constitution the Legislature provided for a new Board of Education, by Chapter 10, Acts 2nd Called Session, 41st Legislature, page 12, approved July 3, 1929 (Vernon's Annotated Civil Statutes, Articles 2675b-1 through 2675b-10). This act provided that the Board of Education should be appointed by the Governor with the advice and consent of the Senate. Section 5 of this act (Vernon's Annotated Civil Statutes, Article 2675b-5a) provided that the new State Board of Education should take over and discharge all duties imposed by the existing laws upon the Board of Education in existence at the time of the passage of the act, and further provided with reference to the Textbook Commission as follows:

"(e) The State Textbook Commission shall no longer meet or function after the taking effect of this Act, and the duties heretofore devolving by law upon the State Textbook Commission shall be performed by the State Board of Education, created in this Act, and the State Board of Education, hereby created shall for the purpose of disposing of textbook matters meet at times and places that the State Textbook Commission is required to meet and act under existing law."

The foregoing summary of the history of the various statutory enactments and constitutional amendments since the constitutional amendment adopted in 1918, providing that the State should furnish free textbooks to the pupils in the public schools of this State, shows that the Legislature has construed the Constitution to permit the Legislature to retain power over the manner of the purchase and distribution of textbooks by the Board of Education, and the Legislature has, by detailed statutes, provided the manner in which the

textbooks should be purchased and distributed.

An examination of the appropriation laws passed by the Legislature since the establishment of the textbook fund shows that the Legislature has for each biennium made an appropriation of the free textbook fund. The first of these appropriations appears in Chapter 87, Acts First Called Session, 36th Legislature (1919), page 399, at page 424, and is as follows:

"Also for the support of Public free schools, and for free text books for two years, all of the available free school fund arising from the interest or lease of school lands, interest on bonds, school taxes and all other sources of revenue to said fund; provided that the text books may be purchased only from funds arising from State ad valorem school tax."

Substantially the same language is used by the Legislature in the following biennial appropriation laws: Chapter 53, Acts First Called Session, 37th Legislature (1921), 172, 185; Chapter 28, Acts Third Called Session, 38th Legislature (1923), 235, 247; Chapter 196, Acts Regular Session, 39th Legislature (1925), 515, 549; Chapter 100, Acts First Called Session, 40th Legislature (1927), 263, 278; Chapter 16, Acts Third Called Session, 41st Legislature (1929), 398, 419; Chapter 286, Acts Regular Session, 42nd Legislature (1931), 671, 698.

The first appropriation law appropriating specific sums out of the textbook fund is the appropriation for the biennium ending August 31, 1935, Chapter 166, Acts Regular Session, 43rd Legislature (1933), page 428, at page 469, which reads as follows:

"Textbook Administration (Payable out of Textbook Fund):

Per diem and expense, textbook committee and Board of Education when engaged in textbook matters, payable out of the Textbook Fund.....$850.00   $850.00


Total Textbook Administration................ 850.00   850.00

For the purposes provided by law there are also appropriated for the two (2) years ending August 31, 1935, to the State Board of Education, all income to, and any balances in, the State Textbook fund and the Available School Fund, except as otherwise appropriated by this Legislature, to be expended and distributed in accordance with the laws of this State; provided that textbooks may be purchased only from funds arising from the State ad Valorem School Tax."

The 44th Legislature returned to the policy of appropriating the entire textbook fund to the State Board of Education without specification of the manner in which the sum should be spent. The provision of Chapter 364, Acts Regular Session, 44th Legislature (1935), page 1049, at page 1097, with reference to the textbook fund, is as follows:

TEXT BOOK ADMINISTRATION
(Payable out of the Text Book Fund)

"For the purposes provided by law, there are also appropriated for the two years ending August 31, 1937, to the State Board of Education all income to, and any balances in, the State Textbook Fund and the Available School Fund, except as otherwise appropriated by this Legislature, to be expended and distributed in accordance with the laws of this State; provided that textbooks may be purchased only from funds arising from the State ad valorem school tax."

A general appropriation was also made by the 45th Legislature, Chapter 504, Acts Regular Session, 45th Legislature, page 1362 (1937), at page 1419, in the following language:

"Available School Fund Aid and Text Book Administration

"For the purposes provided by law, there are appropriated for the two years ending August 31, 1939, to the State Board of Education all income to, and any balances in, the Available School Fund and the State Textbook Fund, except as otherwise appropriated by this Legislature, to be expended and distributed in accordance with the laws of this State; provided that textbooks may be purchased only from funds arising from the State ad valorem school tax.

"It is hereby provided that any amount expended for Text Book Administration, including new text books, rebinding, and any other expenses connected therewith, shall be paid out of the State Text Book Fund.

"It is further provided that the amounts to be expended for new text books, rebinding books, equipment, maintenance, contingent expenses and miscellaneous expenses shall be as fixed by the State Board of Education.

"All employees in the Text Book Division of the Education Department shall be appointed by the State Superintendent of Public Instruction, with the approval of the State Board of Education. No employee shall be discharged except when authorized in writing by the State Board of Education."

In the general Departmental Appropriation Bill passed by the 46th Legislature, for the biennium ending August 31, 1941, being Senate Bill 427, we find that the Legislature has specified, under the heading "Employees of the Text Book and Curriculum Division and Text Book Depository," the number of employees and the salaries to be paid to such employees, in the Text Book Division.

Under the heading, "Maintenance and Miscellaneous," appears the following:

"1.   Office and Depository Supplies,
Postage, Express, Drayage, Telephone, Tele-
graph, Printing, Stationery, Rent, Contin-
gent expense, including freight on used
textbooks...................................$25,000.00  $25,000.00
  "2.   Rebinding....................... 23,360.00   23,360.00
        Total - Maintenance and
                Miscellaneous........$48,360.00  $48,360.00
        Grand Total, Textbook Div....$94,230.00  $94,230.00

"This appropriation shall be as above
provided and no other salary or expenditure shall
be paid for any purpose other than those itemized
herein."

Following the portion of Senate Bill 427 just
quoted, there appears the following:

"Available School Fund Aid and Textbook Administra-
tion

"For the purposes provided by law, there are ap-
propriated for biennium ending August 31, 1941, to
the State Board of Education all income to, and any
balance in, the Available School Fund and the State
Textbook Fund, except as otherwise appropriated by
this Legislature, to be expended and distributed
in accordance with the laws of this State; provided
that textbooks may be purchased only from funds
arising from the State ad valorem school tax.

"It is hereby provided that any amount expended
for Textbook Administration, including new textbooks,
rebinding, and any other expenses connected there-
with, shall be paid out of the State Textbook Fund.

"It is further provided that the amounts to be
expended for new textbooks and rebinding books
shall be as fixed by the State Board of Education;
provided, however, that no employees, in addition
to those listed and itemized above, shall be em-
ployed.

"All employees in the Textbook Division of
the Education Department shall be appointed or
removed by the State Superintendent of Public
Instruction subject to the approval of the State
Board of Education." (Emphasis added)

We have gone into some detail in tracing the history
of the general statutes and appropriation laws relating to the
textbook fund for the purpose of showing the construction of
the constitutional provisions relating to free textbooks, which
has been followed by the Legislature.  We believe that an ex-
amination of the general statutes and appropriation laws shows
first, that the Legislature has exercised active control over
the manner of the purchase and distribution of free textbooks,
while leaving the details of administration to the Textbook
Commission and to the Board of Education; and second, that the
Legislature has made an appropriation biennially of the text-
book fund, and has, on occasion, specified the manner in which

the textbook fund shall be expended by the Board of Education. In other words, the Legislature has construed the Constitution so as to permit the Legislature to control the manner of the purchase and distribution of free textbooks, and to permit the Legislature to appropriate and to direct the expenditure of the textbook fund.

The legislative construction of the constitutional provisions, which was adopted almost immediately after the passage of the constitutional amendment providing for free textbooks, and which has been followed ever since for a period of over twenty years, is highly persuasive in determining what construction should be adopted by the court. In the case of Jones vs. Williams, 121 Tex. 94, 45 S. W. (2d) 130, Mr. Chief Justice Cureton said:

"The rule is that contemporaneous construction of a constitutional provision by the legislature, continued and followed, is a safe guide as to its proper interpretation. Cooley's Constitutional Limitations (8th ed.), Vol. 1, p. 144, and other authorities post."

Again, in the case of Gunn vs. Marrs, 120 Tex. 383, 40 S. W. (2d) 31, Mr. Chief Justice Cureto said:

". . . The universal rule of construction is that legislative and executive interpretations of the organic laws, acquiesced in and long continued, as in the case before us, are of great weight in determining the validity of any act, and in case of ambiguity or doubt will be followed by the courts. 9 Texas Jurisprudence, p. 439, sec. 27; 6 Ruling Case Law, p. 62, secs. 59, 60, 61, 62; Cox v. Robison, 105 Texas 426, 439, 150 S. W. 1149; G. C. & S. F. Ry. Co. v. Dallas (Texas Com. App.), 16 S. W. (2d) 292, 294; Greene v. Robison, 117 Texas 516, 535, 8 S. W. (2d) 655; Theisen v. Robison, 117 Texas 489, 8 S. W. (2d) 646; Walker v. Meyers, 114 Texas 225, 266 S. W. 499; Timbrough v. Barnett, 93 Texas 301, 55 S. W. 120 . . ." (Emphasis by the court.)

See also Koy vs. Schneider, 110 Tex. 369, 221 S. W. 880, p. 885.

Aside from the legislative construction of Article 7, Section 3, we believe that a consideration of this section leads to the conclusion that it was not the purpose of this section to confer on the Board of Education control over the manner of the expenditure of the free textbook fund, independent of any control by the Legislature. It is fundamental that in Texas, as well as in the other states in the American Union, all legislative power is vested in the Legislature, unless such power is limited by a clear prohibition or restriction in the State Constitution or the Federal Constitution. Under the Constitution of Texas, legislative power is conferred upon the State Legislature. The relevant provisions of the State Constitution are as follows:

"Article 2. Section 1. The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to-wit: Those which are legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

"Article 3. Section 1. The Legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled 'The Legislature of the State of Texas.'"

"Article 3. Section 42. The legislature shall pass such laws as may be necessary to carry into effect the provisions of this Constitution."

It is well settled that the Constitution of Texas is not a grant of powers to the State Legislature, but is to be construed as a limitation on the powers of the Legislature, and that where such limitation is not to be found in the Constitution, the powers of the Legislature are unrestricted. In the case of Smisson vs. State, 71 Tex. 222, 9 S. W. 112, Mr. Chief Justice Stayton said:

"The purpose of a State constitution is not to confer power upon the people which may be exercised through the Legislature, but is to place limitations which the people desire to impose upon the exercise of power by the Legislature and other departments of the government."

In the case of Brown vs. City of Galveston, 97 Tex. 1, 75 S. W. 489, the Supreme Court of this State said:

"By section 1 of article 3, the Constitution declares, 'The legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled "the Legislature of the State of Texas."' 'The legislative power of this State' means all of the power of the people which may properly be exercised in the formation of laws against which there is no inhibition expressed or implied in the fundamental law."

The same principle is stated in the case of Charles Scribner's Sons vs. Marrs, 114 Tex. 11, 262 S. W. 722, where Mr. Justice Pierson said:

"The State Legislature may exercise all the legislative power of the people, subject only to the limitations expressed in the Constitution of the state or of the United States, Brown v. Galveston, 97 Tex. 1, 75 S. W. 488; Conley v. Daughters of the Republic, 106 Tex. 90, 156 S. W. 197, 157 S. W. 937; Encyclopedic Digest (Michie) Vol. 4, pp. 406, 407, 408."

See also Ferguson v. Wilcox, 119 Tex. 280, 28 S. W. (2d) 526.

Not only is general legislative power conferred upon the Legislature by the Constitution, but we also find express provisions in the Constitution directing the Legislature to exercise control over the education system of this State. All of Article 7 of the Constitution relates to the subject of education, and contains, as well as specific directions to the Legislature, the following general mandate, in Article 7, Sec. 1:

"Section 1. A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

With reference to educational matters, as well as with reference to legislative matters generally, the powers of the Legislature are unlimited except where they are clearly limited by the provisions of the Constitution. On this point Mr. Chief Justice Cureton said in the case of Mumme vs. Marrs, 120 Tex. 383, 40 S. W. (2d) 31:

"Under our Constitution public education is a division or department of the government, the affairs of which are administered by public officers, and in the conduct of which the Legislature has all legislative power not denied it by the Constitution, State Const. Art. 7, Sec. 3, sec. 42; Cooley's Const. Lim. (8th Ed.), Vol. 1, p. 176; 9 Texas Jurisprudence, p. 453, sec. 38; El Dorado Ind. School Dist. v. Tisdale (Texas Com. App.), 3 S. W. (2d) 420; Ferguson v. Academy Consol. Ind. School Dist. (Texas Civ. App.), 14 S. W. (2d) 1051; 24 Ruling Case Law, p. 558, sec. 2." (Emphasis added)

The question here involved not only relates to the education system of this State, but it also involves the control over the expenditure of public funds. There are specific provisions in the Constitution with reference to the control over the expenditure of public moneys by the Legislature. Article 3, Section 44, of the Constitution provides in part as follows:

"Sec. 44. The Legislature shall provide
by law for the compensation of all officers,
servants, agents and public contractors, not
provided for in this Constitution. . ."

Article 8, Sec. 6 of the Constitution provides
as follows:

"Sec. 6. No money shall be drawn from
the Treasury but in pursuance of specific ap-
propriations made by law; nor shall any ap-
propriation of money be made for a longer term
than two years, except by the first Legislature
to assemble under this Constitution, which may
make the necessary appropriations to carry on
the government until the assemblage of the six-
teenth Legislature."

There is no doubt that the textbook fund consti-
tutes a public fund. In the absence of any clear consti-
tutional provision to the contrary, the Legislature has
control over this fund, by reason of its inherent powers
under our form of government. The control over the purse
strings of the government is the power which historically
is most closely associated with the legislative branch of
the government, and no construction should be given to the
Constitution which would remove this power from the Legis-
lature, unless there are clear and compelling reasons for
such construction. In the case of Colbert vs. State, 86
Miss. 769, 39 So. 65, the Supreme Court of Mississippi said:

"Under all constitutional governments re-
cognizing three distinct and independent magis-
tracies, the control of the purse strings of
government is a legislative function. Indeed,
it is the supreme legislative prerogative, in-
dispensable to the independence and integrity
of the Legislature, and not to be surrendered
or abridged, save by the Constitution itself,
without disturbing the balance of the system
and endangering the liberties of the people.
The right of the Legislature to control the pub-
lic treasury, to determine the sources from which
the public revenues shall be derived and the ob-
jects upon which they shall be expended, to dic-
tate the time, the manner, and the means both of
their collection and disbursement, is firmly and
inexpugnably established in our political system.
This supreme prerogative of the Legislature,
called in question by Charles I, was the issue
upon which Parliament went to war with the King,
with the result that ultimately the absolute
control of Parliament over the public treasury
was forever vindicated as a fundamental principle
of the British Constitution. The American com-
monwealths have fallen heirs to this great prin-
ciple, and the prerogative in question passes to
their Legislatures without restriction or diminu-
tion, except as provided by their Constitution,
by the simple grant of the legislative power."

We find an expression of the same principle in the case of Humbert vs. Dunn, 84 Calif. 57, 24 Pac. 111, by the Supreme Court of California:

> "The limitation that 'no money shall be drawn from the treasury but in consequence of appropriations made by law' is taken literally from the Constitution of the United States. Its object is to secure to the legislative department of the government the exclusive power of deciding how, when and for what purposes the public funds shall be applied in carrying on the government. 2 Ops. Atty. Gen. 670. It had its origin in parliament in the seventeenth century, when the people of Great Britain, to provide against the abuse by the King and his officers of the discretionary money power with which they were vested, demanded that the public funds should not be drawn from the treasury except in accordance with express appropriations therefor made by parliament, (Hall. Hist. 555;) and the system worked so well in correcting the abuses complained of, that our forefathers adopted it, and the restraint imposed by it has become a part of the fundamental law of nearly every state in the Union."

With these general principles in mind, we believe that it must be concluded that it was not the intention of Article 7, Section 3, as amended, to remove control over the expenditure of the textbook fund from the Legislature, and to place it in the hands of the State Board of Education. Under Section 8 of Article 7 of the Constitution, as it was amended in 1926, and under the statutes passed by the Legislature in pursuance of said amendment, the Board of Education is an administrative Board, whose members are appointed by the Governor. It would be a radical departure from recognized principles of our form of government to place control over a large amount of public funds in the hands of such an administrative board, free from all control by the Legislature, and it would further be in direct conflict with the provisions of Article 3, Section 44, and Article 8, Section 6, of the Constitution, quoted above.

There is nothing in the language of Article 7, Section 3, which would compel the conclusion that the State Board of Education is to have unlimited control over the expenditure of the textbook fund. If such construction were adopted, it would have to be based on an implication from the words in Article 7, Section 3, rather than on any direct expression therein. The language of the amendment is merely that "It shall be the duty of the State Board of Education to set aside a sufficient amount out of said tax to provide free textbooks for the use of children attending the public free schools of this State." The Constitution does not make it the duty of the State Board of Education to provide free textbooks, but merely to set aside a sufficient amount for this purpose. In this respect, the language of Section 3, of Article 7 of our Constitution is clearly distinguishable from the language

employed in the Missouri statute involved in the case
of State ex rel. Shelchel vs. Claxton, 263 Mo. 701,
173 S. W. 1049, where the statute directed the school
district "to provide for an eight months school."

In the Missouri case just cited, the court takes
cognizance of the distinction between a direction to "pro-
vide for an eight months school" and to "provide the nec-
essary funds for an eight months school," as follows:

". . . If the clause reads 'provide the
necessary funds for an eight months' school',
instead of the clause which is used, to-wit,
'provide for an eight months' school', then
there might be ground for the construction
evidently given to the section by the trial
court. But since the clause requires that
the district 'provide for an eight months'
school', we are unable to see how the stat-
ute can be said to have been complied with,
under the facts in the present case, unless
an eight months' school is actually had."
(Emphasis added)

It may be argued that it is necessary that the
State Board of Education have control over the manner of
the expenditure of the free textbook fund in order that
the Board of Education may know exactly how much money
will be necessary to be set aside for this purpose, and
that the purpose of the amendment to furnish free text-
books to the school children of this state might be de-
feated by the failure of the Legislature to make ade-
quate provision for the salaries of persons employed to
purchase and distribute the free textbooks. The amount
which has to be set aside for textbooks can generally
be determined by the expenditures in the past, and under
Article 2869, Vernon's Annotated Civil Statutes, the
Board of Education is given the right to set aside 25 per
cent in addition to the amount estimated by the State
Superintendent, to take care of emergencies. It is un-
doubtedly true that the Legislature would have the power,
by arbitrarily and capriciously limiting the appropria-
tion for textbooks, to hamper seriously the purchase and
distribution of free textbooks to the pupils in the pub-
lic schools of this State. It is hardly thinkable, how-
ever, that this situation would arise as a practical mat-
ter. Furthermore, the danger that such situation might
arise is one that is inherent in our form of government,
where a cooperation between all branches of the government
is necessary in order that the functions of the government
may proceed smoothly and efficiently. We cannot assume
that the Legislature of this State would be unreasonable
in the exercise of its power over the expenditure of the
textbook fund, any more than we can assume that the Board
of Education would act arbitrarily or capriciously in set-
ting aside the amount which it believes to be necessary
for the purpose of providing free textbooks for the school
children of this State.

We do not think that there is anything in the
decisions of the Supreme Court in the cases of American
Book Company vs. Marrs, 113 Tex. 291, 253 S. W. 817, and
Charles Scribner's Sons vs. Marrs, 114 Tex. 11, 262 S. W.
722, which would compel the conclusion that the Board of

Education has unlimited control over the expenditure of the textbook fund. As we have already pointed out, the questions actually decided in these cases were that the Board of Education, under the Constitution and under the statutes then in effect, had the ultimate power of making the contracts for the purchase of free textbooks, and, where such contracts had received the approval of the Board of Education, a writ of mandamus could be issued against the Superintendent of Public Instruction to compel the performance of such contracts.

Furthermore, we wish to point out that at the time of the decisions of the cases just cited, Section 8 of Article 7 of the Constitution expressly conferred on the Board of Education the power to distribute the school funds to the several counties. This constitutional power has been taken away from the Board of Education by the amendment to Section 8 of Article 7, which was adopted on November 6, 1928. In so far as the language in the opinions in these two cases is dependent upon the provisions of Section 8 of Article 7 of the Constitution, as it read before its amendment in 1928, such language is no longer applicable. However, we think it is of considerably more importance that the Supreme Court did not have before it the question of the power of the Legislature to control the expenditure of the textbook fund. Under the statutes which were then in force, the Board of Education had the ultimate control over the making of contracts for the purchase of school books, and the question was not raised directly or indirectly, as to the power of the Board of Education to spend a part of the textbook fund, independently of or contrary to statutes enacted by the Legislature.

Furthermore, we wish to point out that our Supreme Court has held that where there is a grant of power in the Constitution to an officer or board, without definition of the manner in which it is to be exercised, the Legislature may prescribe the manner in which he duty may be performed. Upon this point Mr. Justice Moore of the Supreme Court said in the case of Justin vs. Gulf, Colorado and Santa Fe Railroad Co., 45 Tex. 234, at page 265:

". . . . In our opinion, however, the sounder conclusion is, that where there is a grant of power in the Constitution to a department of Government, or to a constitutional or statutory officer, or tribunal, without defining the manner and form on or by which it is to be exercised and carried into effect, the Legislature may legitimately prescribe reasonable rules by which this may be done."

In view of all of the considerations discussed above, it is our opinion that the Legislature retains control over the expenditure of the Textbook Fund, and particularly that it can fix the salaries and limit the number of employees that shall be paid out of said fund for the purchase and distribution of textbooks. We now turn to a consideration of the appropriation law passed by the last Legislature to determine the power of the Board of Education thereunder to employ additional employees.

An examination of the biennial appropriation bill adopted by the last Legislature, Senate Bill 427, 46th Legislature, Regular Session, shows, we believe, without any question, that the Legislature intended to limit the number of employees which could be employed by the Board of Education and paid out of the textbook fund. The provisions of this appropriation bill already have been quoted in this opinion, and we direct particular attention to the provision on page 57 of said bill that "no employees, in addition to those listed and itemized above, shall be employed." We believe that this is an express limitation by the Legislature upon the number of employees which can be hired by the State Board of Education and paid out of the textbook fund, that such limitation by the Legislature is constitutional, and that the Board of Education would not be permitted to hire additional employees out of this fund, even though it should believe that the Legislature did not make provision for a sufficient number of employees.

The opinion here expressed is in accord with the previous opinion of this department, being Opinion No. 0-495, addressed to Honorable E. H. Thornton, Jr., Chairman of the Appropriations Committee of the House of Representatives. The conclusion here reached is also in accord with the conclusion reached in Opinion No. 0-1356, addressed to Honorable Geo. H. Sheppard, Comptroller of Public Accounts. In the latter opinion, we held that the Board of Education could use a part of the textbook fund for necessary traveling expenses to be incurred in the purchase and distribution of free textbooks. We believe that the conclusion there reached is correct. It will be noted that under the heading "Employees of the Textbook and Curriculum Division and Textbook Depository", the Legislature does not specify any item for traveling expenses. Furthermore, under the heading "Available School Fund Aid and Textbook Administration," the Legislature makes a general appropriation to the Board of Education of "all income to, and any balance in, the Available School Fund and the State Textbook Fund, except as otherwise appropriated by this Legislature, to be expended and distributed in accordance with the laws of this State. Under Article 2876 of Vernon's Annotated Civil Statutes, it is provided that necessary expenses of providing free textbooks shall be paid from the State Textbook Fund. Aside from the limitation on the number of employees, which is specifically made in a later paragraph under the same heading, we do not believe that it was the intention of the Legislature to limit the expenditure of the textbook fund by the Board of Education, except with reference to the items for which specific appropriations were made. Since there was no specific appropriation for traveling expenses, we believe that the State Board of Education is authorized to expend such portion of the textbook fund as may be necessary for traveling expenses

Honorable Geo. H. Sheppard, November 7, 1939, page 21


in the purchase and distribution of textbooks. In so
far as our opinion No. C-1356 held that it was beyond
the constitutional power of the Legislature to place
restrictions upon the expenditure of the textbook fund
by the Board of Education, such opinion is overruled.

                              Very truly yours

                         ATTORNEY GENERAL OF TEXAS


                    By  James P. Hart
                              James P. Hart
                              Assistant

JPH:jm

        This opinion has been considered in conference,
approved, and is now ordered filed.

                         Gerald C. Mann
                              Gerald C. Mann
                         ATTORNEY GENERAL OF TEXAS